**TANGFELDT WOOD PRODUCTS, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 83–1373.**

United States Court of Appeals, Federal Circuit.

May 9, 1984.

Thomas F. Spaulding, Washington, D.C., argued for appellant. With him on the brief was Alan I. Saltman, Washington, D.C.

R. Anthony McCann, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Stephen G. Anderson, Washington, D.C.

Before FRIEDMAN, DAVIS and NIES, Circuit Judges.

DAVIS, Circuit Judge.

The Department of Agriculture Board of Contract Appeals (BCA or Board) denied recovery to a contractor (under a timber sale contract) for the cost of cutting and preparing for removal timber which remained on the sale area after the contract was terminated by the Government under a special provision dealing with catastrophies. In the circumstances of this case, we affirm.

I

In October 1979 appellant Tangfeldt Wood Products, Inc. (Tangfeldt) was awarded by the Forest Service of the Department of Agriculture the Worm Salvage timber sale contract for the removal and purchase of several types of timber from a government forest in Oregon. The original termination date of the contract was March 31, 1981; this was later extended until March 31, 1982 (and again to April 30, 1982). The normal operating season was June 1st to November 30th of each year.

Tangfeldt commenced operations in March 1981 and continued through July 1981; removal of cut timber stopped in June 1981, and apparently was never resumed. By October 1981, appellant had failed to pay the required deposit (due in September 1981) for extension of the termination date, and by letter of October 5th Agriculture gave it 30 days to pay that sum. Shortly thereafter (October 16, 1981), the Forest Service informed Tangfeldt in writing of the importance of removing during the 1981 operating season timber which had been previously cut but not removed.

On November 13 and 14, 1981, a wind storm blew down a considerable amount of timber within the Worm Salvage timber sale area. Before that blow-down Tangfeldt had felled, bucked, yarded and decked some 500 Thousand Board Feet (MBF) of timber at a cost of $30.50 per MBF.[1] This timber was not removed but remained on the site.

There followed a series of suggestions and counter-suggestions, apparently rooted in the damage caused by the blow-down. A Forest Service letter of December 8, 1981, told Tangfeldt that unless it paid the unpaid deposit (mentioned above) by December 30th, the sale would be cancelled for breach. This date was extended to February 2, 1982, if appellant agreed to a contract modification proposed by the Government. That modification provided for the deletion from the sale of all timber except for that in the area of the decked logs, and also called for payment of the deposit. On February 2nd appellant stated that it would not accept the proposed modification.

A week later (February 9, 1982), Tangfeldt asked for a two-year extension of the contract. On April 1st, the Forest Service approved a two-year extension to March 31, 1984, contingent on appellant's execution of a proposed contract modification. Appellant never executed the modification.

Meanwhile the contract term was extended to April 30, 1982.

On April 9th, Tangfeldt requested termination of the sale for catastrophe (due to the blow-down) under clauses B2.133 and B8.221 of the contract. Clause B2.133 defines "Catastrophic Damage" and clause B8.221 authorizes unilateral termination for catastrophe by the contractor if certain conditions are met. By letter of April 16th, the Forest Service determined that the blow-down qualified as catastrophic damage,[2] but also that the conditions of B8.221 were not met. However, the damage qualified for *Government* termination under B8.222 (another clause dealing with catastrophies) if the contractor did not agree to a catastrophic modification under B8.33 (still another catastrophe clause). Appellant did not desire such a modification and waived its 30-day contractual period for considering such a modification.

Accordingly, on April 21, 1982, the Agriculture Department terminated the Worm Salvage timber sale for catastrophe damage under clause B8.222, *supra*. Thereafter, the Forest Service resold the Worm Salvage contract timber, including the 500 MBF of merchantable timber previously felled, bucked, yarded and decked by Tangfeldt and left by it on the site after the termination. The resale was awarded to another bidder but Tangfeldt was the runner-up.

This case arose because appellant filed a claim (on May 7, 1982) with the contracting officer seeking $15,250 for the work it performed on the 500 MBF of timber remaining in the area. The contracting officer denied the claim and the Board rejected Tangfeldt's appeal to that tribunal. The contractor now appeals here under the Contract Disputes Act, as amended by the Federal Courts Improvement Act.

## II

Tangfeldt does not contend that the Government was unauthorized to terminate

---

1. To "fell" is to cut down a tree; to "buck" is to saw felled trees into logs; to "yard" is to haul logs from the cutting area to a landing; to "deck" is to pile yarded logs in an orderly fashion.

2. It is agreed that the blow-down fell under the definition of clause B2.133 ("Catastrophic Damage").

the sale for catastrophe as it did, nor is there any claim that the specific terms of the special catastrophe clause so empowering the Forest Service (B8.222) required payment of the sum now demanded.[3] The sole argument is that the contractor is entitled to restitution for benefits it conferred on the Government. The BCA found that appellant—by its felling, bucking, decking, and yarding of the 500 MBF—had enhanced the value of that timber beyond the value the timber would have had in its natural condition as standing timber; the Board also seemed to imply that, because of that enhanced value, the Forest Service may well have received a better bid on the resale of that timber.[4] Though the appellee challenges that finding, we accept it as adequately supported. The question then is whether that is a benefit for which the United States owes restitution.

Appellant's principal argument is that the catastrophe termination was effectively a termination for impracticability of performance (because of the blow-down) and under a well-settled common law rule the contractor is entitled to restitution for benefits it conferred on the Government by way of past performance prior to such termination. We are asked to apply the principle of such decisions as *Clark v. United States*, 95 U.S. 539, 24 L.Ed. 518 (1877) (quantum meruit for recovery for past per-

formance of invalid oral sea carriage contract frustrated by a wreck of the ship); *Crocker v. United States*, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533 (1916) (quantum valebant recovery for past performance of contract invalid for contractor's fraud and rescinded by the Government); *Yosemite Park and Curry Company v. United States*, 582 F.2d 552, 560–61 (Ct.Cl.1978) (quantum meruit recovery for services actually rendered under a contract invalid for violation of statutes and regulations); *New York Mail and Newspaper Transportation Co. v. United States*, 154 F.Supp. 271, 139 Ct.Cl. 751 (1957), *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957) (damages allowed to put contractor in same position as it would have occupied without the invalid contract). The blow-down causing the termination here is said to render further performance impracticable and the Government is said to be responsible for the work performed by Tangfeldt before the termination.

Answering that contention are two separate points—both mentioned by the BCA—which we accept.[5] The first is that—quite unlike the cases cited *supra* in which the Government bargained for and desired the very services or products actually furnished by the contractors under the invalid arrangements—the Government's only purpose here was to sell timber and have it removed.[6] The Forest Service left it to

---

**3.** The termination clause under which the Government acted ("B8.222 Termination by Forest Service") provided: "This contract shall be terminated by written notice from Forest Service if there is Catastrophic Damage and Purchaser does not agree under B8.33 ["Modification for Catastrophe"] to one or a combination of the following within 30 calendar days of receipt from Forest Service of contract modifications proposed to permit the harvest of the catastrophe-affected timber in the areas outlined under B8.33 ... [setting forth modifications to which Purchaser must agree]."

The Board found that, if the Forest Service had not terminated for catastrophe (in the absence of appellant's agreement to the proposed modifications), the whole contract could have been terminated for breach. Appellant would then be liable to the Government for any failure of the latter to receive, on resale, the full amount Tangfeldt agreed to pay in its contract. Tangfeldt makes the point that, in such a resale

after default, it would have been given a credit (in determining the excess it might have to pay) for its work in felling, bucking, yarding and decking—but it skips entirely the prime fact that it would otherwise have been fully responsible for any loss suffered by the Forest Service on the resale. That was not true on the termination for catastrophe.

**4.** *I.e.*, the new contractor on the resale could offer more because it would not have to pay those costs for felling, bucking, decking, and yarding.

**5.** We do not consider other points urged by the Government.

**6.** This is indicated, for one thing, by the Forest Service's October 1981 written communication to Tangfeldt of the importance of removing during the 1981 operating season timber which had been already cut and not removed. *See* Part I, *supra*.

Tangfeldt to cut and remove the timber, and was not benefited by or interested in the felling, bucking, yarding, and decking if the contractor fulfilled the only desired function of cutting and removing the trees.[7] In this case there happened to be a benefit with respect to the prices received on resale, but that benefit was not an object of the arrangement between Tangfeldt and the Forest Service. The benefit came about because the contractor performed the work for its own purposes and convenience, in order to remove the timber under the contract. In the terminology of the Restatement of Restitution, that benefit was "officiously conferred" on the Government, and restitution is not owing. *See* A.L.I. Restatement of Restitution, Second, Tent.Draft No. 1, § 2, and illustration 2, at 35. This was "a benefit not bargained for" (*id.* at 37) and the circumstances do not call for restitution by the unintended beneficiary.

The second answer to Tangfeldt is that the felling, etc. all occurred before the blow-down on November 13–14, 1981, and the termination did not take place until April 21, 1982, some six months later. Tangfeldt did not remove the lumber at any time during that period, though it could have done so. As the Board found, "it does not appear that it was beyond Appellant's power to have removed the timber and attempted to recover the fruits of its labors."[8] Appellant strenuously argues that it was not required to remove the timber until the end of the contract (which had been extended to April 30, 1982, and might have been extended still further), and should not be sanctioned for acting on its contract rights. But that is not the question, which is, rather, whether a party conferring a benefit on another can still obtain restitution even though that party had plentiful opportunity to obtain the benefit for itself but failed or refused to do so.

Appellant had a long time in which to remove the timber, sell it, and attempt to recoup the costs incurred (prior to the blow-down) in the felling, etc. operations. It did not do that but instead chose to wait and try to saddle the Forest Service with the very costs which it had the opportunity to recoup for itself.

In denying appellant's claim, the contracting officer said: "Prior to termination, you had every opportunity to remove the volume and recover your incurred costs. However, you made a considered business decision not to remove this timber." Appellee makes a strong argument that during the relevant period the market price for timber was below the price that Tangfeldt had agreed to pay the Forest Service, and that that is the reason why Tangfeldt refused to remove and pay for the timber—thus saving itself a substantial part of the nonrecoupable money it would have to pay the United States if the timber were removed. If that is so, that could be the "considered business decision" to which the contracting officer referred.

Acknowledging that market prices were lower than expected, Tangfeldt makes the converse argument that it was somehow compelled by that fact to retain the felled timber on the contract site—and therefore that it should not be considered to have had the opportunity to remove the timber. That position stands this timber sales contract on its head. One thing is certain about that agreement—Tangfeldt bore the general risk (and obtained the advantage) of changing market prices and cannot be deemed compelled to defer removal simply by the fact of low prices. If there had been no blow-down and no termination for catastrophe, it is undeniable that appellant would have no comparable claim for restitution for felled, etc. timber left in the area at the end of the regular contract term.

---

7. The contract's specific directions with respect to cutting and removing the timber were obviously to protect the forest or remaining timber from improper contractor activities, not to give the Government a direct benefit from any of the intermediate steps prior to removal. Clause B3.43 ("Designated Timber Cut But Not Removed") contemplated removal of the cut timber and does not appear to consider the Government as benefiting from cut timber left on the site.

8. In particular, appellant has not shown that it could not remove the timber during the normal operating season.

Changing market prices would give no such rights to the contractor in that situation, and they have no greater impact here because the Forest Service properly terminated for catastrophe. The risk of lower timber prices rested squarely on Tangfeldt and loss resulting from that risk cannot be thrust on the Government in the form of a claim for unjust enrichment. *Cf.* A.L.I. Restatement of Restitution, Second, Tent. Draft No. 1, § 6(2) and at 67–68 (1983).

In sum, we agree with the Board that appellant's conduct did not confer any unjust enrichment on the Government or entitle appellant to restitution. We hold therefore that the Board of Contract Appeals did not err.

AFFIRMED.