**AT&T COMMUNICATIONS, INC., Appellant,**

v.

**Stephen A. PERRY, Administrator, General Services Administration, Appellee.**

No. 01–1619.

United States Court of Appeals, Federal Circuit.

DECIDED: July 12, 2002.

I.

Robert J. Higgins, Dickstein Shapiro Morin & Oshinsky LLP, of Washington, DC, argued for appellant. With him on the brief were James vanR. Springer, Peter W. Morgan, Richard J. Conway, and J. Andrew Jackson. Of counsel was Tina D. Reynolds.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Michael D. Tully, Assistant General Counsel, General Services Administration, of Washington, DC.

Before RADER, BRYSON, and PROST, Circuit Judges.

PROST, Circuit Judge.

AT&T Communications, Inc. ("AT&T") appeals from the decision of the General Services Administration Board of Contract Appeals (the "Board") denying AT&T's claim for restitution based on the government's alleged breach and repudiation of contract or the government's unjust enrichment. *AT&T Communications, Inc.*, GSBCA No. 14732 (May 18, 2001). We have jurisdiction under 41 U.S.C. § 607(g)(1)(A). Because we agree with the Board that the government did not breach or repudiate its contract with AT&T, and that the government was not unjustly enriched, we affirm the Board's decision.

In 1988, the General Services Administration ("GSA") awarded AT&T and Sprint separate and concurrent ten year contracts (the "FTS2000" contracts) to provide telecommunications services to the government. The contracts permitted the government to assign particular federal customers to each contractor's network, and to assign "target shares" of contract revenues to AT&T and Sprint. At the start of the FTS2000 contracts, the government assigned target revenue shares of 60% for AT&T and 40% for Sprint. The contracts also provided that the contractors' revenue targets were subject to change, pursuant to a "price redetermination and service reallocation" process scheduled for 1992 and 1995, the fourth and seventh years of the contract. These processes required AT&T and Sprint to compete against each other for additional contract revenue shares, with 40% of each company's network revenue at risk for reassignment to the other company. For the 1992 process, the government decided to maintain the original target revenue split of 60% and 40%.

In October 1994, the government issued a concept paper outlining the format for the 1995 price redetermination and service reallocation process, the process at issue in this case. The concept paper described three possible outcomes for the competition between AT&T and Sprint: (1) AT&T could win a target revenue allocation of 76% for itself and 24% for Sprint; (2) 40% of AT&T's target share could be transferred to Sprint's target share; or (3) GSA could maintain the existing target shares, as it did for the 1992 competition. The government did not identify which federal agencies might be reallocated as a result of the competition. AT&T and Sprint were

required to respond to the concept paper by submitting price proposals for generic scenarios of service reallocation, without regard to which particular agency might be transferred from one company's network to the other's. The government's concept paper further stated: "It is the government's intent that all required transitions be accomplished within a maximum of 6 months unless otherwise notified by the Government.... The Government reserves the right to adjust the transition timeframes based on actual agencies' services and features to be allocated." At the time of the competition, AT&T's revenue share had increased to approximately 68%. While it stood to gain an additional 8% of revenue under the competition, AT&T was more concerned about its competitive positioning with respect to Sprint, including the potential loss of 40% of its revenue share to Sprint. To avoid this loss, AT&T submitted an aggressive final price proposal offering the government escalating discounts over the remaining life of the FTS2000 contract.

The government determined that AT&T's proposal was better than Sprint's and that the Treasury Department ("Treasury"), including the Internal Revenue Service ("IRS"), should transfer from Sprint's network to AT&T's in order to achieve the new target revenue shares. However, at a government meeting held on November 30, 1995, members of Treasury expressed concerns about the feasibility of the transition, insisting that no transition work could occur during the tax season, from December through May. In spite of Treasury's concerns, on December 1, 1995, the government presented AT&T with Modification PS251 for execution. PS251 modified contract FTS2000 by incorporating the terms of the government's concept paper and AT&T's responsive proposal. In addition, PS251 stated: "The following agency will transition from Network B [Sprint's network] to Network A [AT&T's network]: Department of Treasury, including IRS 800 service." AT&T executed the modification on December 1, 1995, without being informed about Treasury's conditions for and concerns about the transition.

The transfer of Treasury to AT&T's network was plagued with difficulties and delays. In the fall of 1996, frustrated IRS officials drafted a Service Level Agreement ("SLA") designed to focus attention on resolving specific problems with AT&T's network transfer and provision of services. The SLA provided that it "does not change the [FTS2000] contract; rather, it makes more definite the expectations of the parties...." The SLA set forth specific ways that AT&T should improve its performance, stating that

> [n]o further Treasury Data Services will be transitioned until all problems with FTS2000 are resolved to IRS satisfaction and only after submission of a transition plan approved by Treasury and GSA.

AT&T executed the SLA on November 8, 1996. In the spring of 1997, the Treasury Department advised AT&T that it would not permit any further network transitions. At this point in time, AT&T's revenue share was 71.4%; Sprint's share was 28.6%. Up until this time, and through the remaining term of FTS2000, the government received the discounts provided for by modification PS251.

On July 25, 1997, AT&T advised GSA by letter that

> AT&T asserts a possible right to breach damages and to an equitable adjustment in the FTS2000 contract price. This

right would be based on the government's failure to both implement the contractually mandated Year 7 PR/SR service reallocation to AT&T of 40% of Network B traffic and to comply with its contractual responsibilities for the transition of the Department of the Treasury from Network B to Network A where such failures prevent AT&T from receiving the revenue share promised by PR/SR.

On August 7, 1998, AT&T submitted a certified claim to the contracting officer, requesting, *inter alia,* reimbursement, plus interest, "for the discounts that the [GSA] has incorrectly taken from billings by AT&T after the signing of Modification PS251." AT&T claimed that "various Treasury organizations delayed for long periods and/or flatly refused to transition to AT&T's network." As a result, AT&T argued, the government received the benefit of discounts without providing in exchange the promised transfer of Treasury within six months. The contracting officer denied AT&T's claim and determined that the failure to transition Treasury within six months was AT&T's fault. The government then issued a claim against AT&T for damages.

AT&T filed a complaint with the Board on February 19, 1999, seeking restitution of the discounts given to the government. After holding a sixteen-day trial, the Board denied AT&T's claim in its entirety. *AT&T Communications, Inc.,* GSBCA No. 14732 (May 18, 2001) (the "Board's Opinion"). The Board concluded that the government did not breach its contract with AT&T and that the difficulties in transitioning the Treasury Department were as much the fault of AT&T as the government. *Id.* at 2. On this basis, the Board also denied the government's claim against AT&T.

AT&T appeals, arguing that it is entitled to partial restitution of the discounts it gave to the government because: (1) the government breached its contract with AT&T by withholding material information about the anticipated difficulties of transitioning Treasury; (2) the government repudiated the contract with AT&T by terminating any further transition of Treasury in the spring of 1997; and/or (3) the government was unjustly enriched by receiving all of the promised discounts without providing the quid pro quo of a complete transfer of Treasury within six months. We address each of these arguments in turn.

## II.

■ The scope of our review of the Board's decision is governed by 41 U.S.C. § 609(b), which states:

The decision of the agency Board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). With respect to questions of law, this court reviews the Board's decision *de novo* but gives careful consideration to the Board's legal conclusions in recognition of its considerable experience in construing government contracts. *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1577 (Fed.Cir.

1994). AT&T states that it accepts the Board's findings of fact as true and correct, but that the Board committed errors of law that we should review *de novo*.

### A.

 AT&T first claims that the Board erred by concluding that the government did not breach its contract with AT&T by withholding material information about the anticipated difficulties of transferring the Treasury Department to AT&T's network. According to the Board's findings of fact, the government held a meeting on November 30, 1995 (the day before execution of modification PS251), to discuss whether to adopt AT&T's or Sprint's response to the 1995 price redetermination and service reallocation process. At this meeting, a representative of the Treasury Department stated that it would be impossible to transition all of Treasury to AT&T within six months for two reasons: no transitions could occur during tax season (December through May) and because a new contractor had been selected to run Treasury's Communications System. *Board's Opinion* at 33. The Treasury representative also insisted that AT&T provide services identical to those already provided by Sprint. *Id.* at 34.

None of this information was provided to AT&T before it executed modification PS251. According to AT&T, it relied on paragraph (h) of PS251, which stated that AT&T would receive a complete transfer of Treasury. AT&T argues that the government knew that it was extremely unlikely that the Treasury transition could be accomplished in a manner and on a schedule that would produce a volume of additional business commensurate with the three-year 76% target. The government therefore allegedly breached its contract

through "a misrepresentation ... in the contract documents" that all of Treasury would be transferred, *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728–29 (Fed.Cir.1997), and by failing to disclose its superior knowledge regarding the prospects for a successful transition, *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774, 778 (1963).

 "In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *T. Brown Constructors*, 132 F.3d at 729. A misrepresentation is material "if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Id.* (quoting Restatement (Second) of Contracts § 162 (1979)). In addition, the government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor. *See Helene Curtis*, 312 F.2d at 778.

> To show a breach under the superior knowledge doctrine, a contractor claiming breach by non-disclosure must produce specific evidence that it (1) undertook to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed.Cir.1991).

The Board found that the government did not breach its contract with AT&T because, among other things, the failure to disclose information about the potential difficulty of transferring Treasury "hardly amounts to [a] misrepresentation made to induce the contractor to propose or offer what it would otherwise not have offered." *Board's Opinion* at 92. We agree. The decision to transfer Treasury was not made until "well after the submission of AT&T's best and final" discount proposal for the 1995 price redetermination and service reallocation process. *Id.* at 83. Even if the government had disclosed to AT&T its concerns about Treasury, it was too late for AT&T to change or retract its proposal. *See id.* at 84. In addition, AT&T's proposal was required to address a generic transfer scenario; it was not contingent on the transfer of Treasury or any other particular agency and therefore could not have been induced by the expectation that all of Treasury would transfer to AT&T's network.

Moreover, even without the allegedly crucial information about the difficulty of transferring Treasury, AT&T managed to substantially achieve its target revenue share. As of April 1997, when any further Treasury transfers were allegedly terminated, AT&T had achieved a revenue share of 71.4%, approximately 94% of the *target*. The government never guaranteed AT&T a 76% revenue share; rather, the government's concept paper explicitly stated that "the *potential target* revenue shares" resulting from the process would be 76% and 24% in the event of an AT&T win. That the revenue shares were subject to variation is shown by the fact that AT&T's share increased from 60% to 68% even before the 1995 reallocation process.

To the extent AT&T fell short of the 76% target, the Board determined that this shortfall was partly a result of AT&T's conduct, not the government's failure to disclose information about Treasury. Specifically, the Board found that "AT&T has not shown that it could have transitioned all of Treasury's requirements within six months if it had known of [the Treasury's] conditions." *Board's Opinion* at 2. AT&T does not disagree with the accuracy of this finding by the Board, but rather dismisses it as legally irrelevant in light of *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000). In that case, Mobil Oil and Marathon Oil sought restitution of $158 million paid to the government in 1981 in exchange for lease contracts giving them the right to explore for and develop oil off the North Carolina coast. The companies' rights were conditioned on their obtaining the appropriate government permissions. In 1990, a new law was passed that effectively precluded the companies from obtaining these permissions. The Supreme Court ruled that the government thereby deprived the oil companies of the benefit of their bargain and repudiated its contract with the oil companies. "Because the Government repudiated the lease contracts, the law entitles the companies to that restitution [of the $158 million in up-front payments] whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore." *Id.* at 623–24, 120 S.Ct. 2423.

AT&T equates its discounts to the $158 million in up-front payments made by the oil companies under lease contracts. According to AT&T, because the Supreme Court found that the government was required to pay back the $158 million regardless of whether the contracts would ultimately have been profitable to the oil companies, AT&T is likewise entitled to a

refund of the discounts it gave to the government regardless of AT&T's inability to achieve a 76% revenue share. We disagree. *Mobil Oil* does not address the issue before us: whether the government breached its contract by withholding information. We therefore do not believe that *Mobil Oil* compels us to ignore the fact that AT&T is partly responsible for failing to achieve a 76% revenue share.

For these reasons, we see no error in the Board's conclusion that the government did not breach its contract with AT&T by withholding information about the possible difficulties in transferring the Treasury Department to AT&T's network. AT&T is not entitled to restitution on this basis.

### B.

 AT&T next argues that it is entitled to partial restitution because the government allegedly repudiated its contract with AT&T in the spring of 1997 by discontinuing any further transition activity. Repudiation is a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach." *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423 (quoting Restatement (Second) of Contracts § 250 (1979)). A total breach is one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.* (quoting Restatement (Second) of Contracts § 243 (1979)).

The Board found that at a working group meeting in early March 1997, AT&T was advised by Treasury personnel that further transition of the Treasury Communication System would be canceled. *Board's Opinion* at 68. On March 11, 1997, the entire Treasury network crashed because AT&T failed to provide a properly working circuit. One witness stated that the network had never before suffered an outage of such magnitude. On March 14, 1997, AT&T attempted to obtain clarification of the status of further transitions from the contracting officer. Meeting notes from a March 26, 1997, meeting confirmed Treasury's recommended cancellation and that there was no official response to the recommendation. The Board's findings of fact indicate that as of June 1997 it was still unclear whether Treasury had cancelled any further transitions or whether transitions were merely suspended. *Id.* at 69. In any event, on November 8, 1996, AT&T signed a Service Level Agreement expressly agreeing that the government could halt any further transitions. This Agreement was drafted based on AT&T's perceived poor performance and stated that "[n]o further Treasury Data Services will be transitioned until all problems with FTS2000 are resolved to IRS satisfaction and only after submission of a transition plan approved by Treasury and GSA."

Given the language of the Service Level Agreement, we agree with the Board that the government's actions in the spring of 1997 were "taken fully in accord with an agreement entered into by the parties following Modification PS251." *Id.* at 94. The government did not repudiate its contract with AT&T but rather implemented the terms of the Service Level Agreement, as agreed to by AT&T. AT&T is therefore not entitled to restitution on this basis.

### C.

 Finally, AT&T argues that it is entitled to restitution, regardless of who is at

fault for its failure to attain a 76% revenue share, because the government has been unjustly enriched by retaining discounts "grossly disproportional" to the benefit to AT&T upon which the discounts were contractually premised. AT&T primarily relies on *Barnes Drill Co. v. United States*, 114 Ct.Cl. 340, 84 F.Supp. 646 (1949), wherein the government improperly deducted certain discounts promised by the contractor if the government ordered 95 products. The government ordered the 95 products, but then cancelled its order for 10 products while retaining the discounts for the remaining 85. The government did not technically breach its contract by canceling its order for the 10 products because the contract permitted the government to cancel its order. Nevertheless, the court found that the government was required to return the discounts without regard to the absence of any breach of contract because

> it is quite clear that plaintiff did not intend to allow the discount unless it was given a reasonable opportunity to earn the purchase price under the additional order. Since no opportunity at all was given it to earn the purchase price, the consideration for the allowance of the extra discount has failed, and defendant in equity and good conscience is not entitled to retain it.

*Id.* at 648.

*Barnes Drill* does not support AT&T's broad, "no fault" claim for restitution. The court's decision in that case was based on the fact that "no opportunity at all was given [to the contractor] to earn the purchase price" before the government cancelled its order. *Id.* In contrast, AT&T was given ample opportunity to achieve the target revenue share of 76%, which is reflected by the Board's finding that

AT&T's failure to achieve a full 76% resulted, at least in part, from AT&T's errors and shortcomings. This same concept of a reasonable opportunity to perform is reflected in *Tangfeldt Wood Products, Inc. v. United States*, 733 F.2d 1574, 1577 (Fed. Cir.1984), wherein we considered "whether a party conferring a benefit on another can still obtain restitution even though that party had plentiful opportunity to obtain the benefit for itself but failed or refused to do so." We concluded that the contractor made a business decision to forego an opportunity to recover costs incurred after termination of a contract and that the government therefore had not been unjustly enriched. *Id.* at 1577–78. Likewise, AT&T was given an opportunity to obtain the benefit of a 76% revenue share, but failed to do so. Thus, according to *Tangfeldt* and *Barnes Drill*, AT&T's claim for unjust enrichment cannot be divorced from the Board's finding that AT&T was partly at fault for failing to achieve a 76% revenue share.

AT&T's argument is also premised on its definition of the contract between the parties. According to AT&T, it promised the government discounts in exchange for the transfer of Treasury as stated in paragraph (h) of modification PS251. We agree with the Board that the "principal problem with this claim is AT&T's fundamental assumption that its offer of network-wide discounts was contingent upon all of Treasury's requirements transitioning within the six-month period." *Board's Opinion* at 82. Modification PS251 did not replace contract FTS2000; PS251 modified it. PS251 also incorporated the terms of the government's concept paper and AT&T's discount proposal. As the Board found, AT&T's proposal was required to fulfill generic requirements, without relying specifically on the transfer of any par-

**1316**

ticular agency. *Id.* at 83. The decision to reallocate Treasury as stated in PS251 was nothing more than contract administration undertaken to produce the revenue targets stated by the government's concept paper. *Id.* at 84.

AT&T achieved 94% of its *target* 76% revenue share. As previously discussed, AT&T's revenue share was a potential target, not a guarantee. Moreover, AT&T conceded that it might not achieve the full 76% when it signed the Service Level Agreement that permitted the government to suspend further transfers based on AT&T's unacceptable performance. The government also points out that AT&T obtained other benefits, including the benefit of taking business away from Sprint, as opposed to losing 40% of its business to Sprint, and the benefit of providing telecommunication services to the government in exchange for billions of dollars. The Board found that AT&T also benefited from a "positive positioning in the industry," "the ability to serve new customers," and the competitive advantage "in any new competition to replace the FTS2000 contract." *Board's Opinion* at 30. We therefore disagree with AT&T that the government has received benefits that are "grossly disproportional" to the benefits conferred on AT&T by the contract.

### III.

We agree with the Board that the government did not breach or repudiate its contract with AT&T, nor do we find that the government has been unjustly enriched. The Board's decision denying AT&T restitution is therefore affirmed.

*AFFIRMED.*