**HANSEN BANCORP, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–828C.

United States Court of Federal Claims.

July 26, 2002.

shepherding this *Winstar* case towards resolution of damages, a recrudescence of the parties' disputes is before the court on cross-motions for summary judgment. Ostensibly dealing with damages, the motion implicates elements of liability. At issue is whether plaintiffs must prove causation as an element of a claim for restitution and whether they can recover, under a theory of restitution or reliance, the value of stock exchanged contemporaneously with an assisted merger transaction. Argument is deemed unnecessary.

## FACTS

The facts have been published and will only be repeated as necessary for the present motions. *See Hansen Bancorp, Inc. v. United States ("Hansen I")*, 49 Fed.Cl. 168 (2001). On May 25, 1988, Elmer F. Hansen, Jr., and G. Eileen Hansen ("individual plaintiffs") and Hansen Bancorp., Inc. ("Hansen Bancorp") (all three collectively referred to as "plaintiffs"), entered a Supervisory Merger Assistance Agreement (the "Assistance Agreement") with the Federal Savings and Loan Insurance Corporation ("FSLIC") for the acquisition of the First Federal Savings and Loan of Hammonton ("Hammonton"), which had become insolvent during the 1980's savings and loan crisis. *Id.* at 170. In accordance with the terms of a separate merger agreement (the "Merger Agreement"), Hammonton would be merged with the Raritan Valley Savings and Loan Association ("Raritan") to create Hansen Savings Bank, SLA ("Hansen Savings").[1] In addition to the Merger Agreement, the Assistance Agreement incorporated three other documents by reference: Federal Home Loan Bank Board ("FHLBB") Resolution No. 88–406 (the "FHLBB Resolution") describing conditions of FHLBB approval and contract performance, a letter of forbearance from FHLBB (the "Forbearance Letter") describing regulatory requirements, and an accountant's advisory opinion. *Id.*

The merger was effectuated through the creation of an interim federal stock associa-

Richard E. Miller, Philadelphia, PA, for plaintiffs, David L. Braverman, Braverman Kaskey & Caprara, of counsel.

William G. Kanellis, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant, Michael M. Duclos, Department of Justice, of counsel.

### *OPINION*

MILLER, Judge.

After the court granted summary judgment for plaintiffs on liability and began

---

1. The parties dispute whether Raritan properly may be characterized as a "profitable" institu-

tion at the time that the Assistance Agreement was consummated.

tion ("the Interim Association"), wholly owned by Hansen Bancorp.[2] The parties do not dispute that at this time Hansen Bancorp also owned controlling stock in a bank in Florida (the "Florida Bank"). In turn, Hansen Bancorp is wholly owned by the individual plaintiffs. *Id.*

The Assistance Agreement expressly required that the individual plaintiffs make a $1 million capital contribution to the transaction. *Id.* at 171. With respect to FSLIC, the Assistance Agreement required, in pertinent part, that it provide a $62 million cash contribution and allow Hansen Savings to amortize supervisory goodwill over a 25-year period. FSLIC also was to reimburse Hansen Savings for losses in excess of $5 million on the required sale of certain of Hammonton's so-called "covered assets." The Assistance Agreement was signed by plaintiffs, identified in the recitals as "Investors;" by FSLIC; by the Vice President of Raritan; and by the Vice President of Hansen Bancorp.

The FHLBB Resolution stated that Raritan was to enter a Stock Transfer Stipulation (the "Stock Transfer") whereby it exchanged its stock for that of Hansen Bancorp. It further stated that plaintiffs were to enter a Stock Exchange Agreement (the "Stock Agreement") with Hansen Bancorp whereby they individually exchanged 50,006 shares in Raritan for that of Hansen Bancorp. The parties do not dispute that at this time plaintiffs held all outstanding stock in Raritan. The Stock Agreement was entered May 25, 1998. No Stock Transfer was implemented, evidently because Raritan owned no stock to exchange.

Shortly thereafter, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), phasing out the use of goodwill from the calculation of regulatory capital. Pub.L. No. 101–73, 103 Stat. 188, codified at 12 U.S.C. § 1464(t)(2) (2000). Hansen Savings subsequently became insolvent and was placed into receivership on January 10, 1992. *Hansen I*, 49 Fed.Cl. at 175.

The court already has found that the Assistance Agreement was breached. *Id.* at 177. *Hansen I* determined that both plaintiffs and the Federal Deposit Insurance Corporation (the "FDIC"), on behalf of Hansen Savings, had standing to bring claims against the Government. *Id.* at 172–176.[3] Specifically, the court ruled that plaintiffs were parties to the Assistance Agreement in their individual capacities as shareholders and that nothing in the agreement could be construed to foreclose the Government's liability to shareholders under that agreement. *Id.* at 173–175. Because the parties requested a stay of proceedings pending decision by the Federal Circuit of other *Winstar* cases sponsoring sundry damages theories, this court did not resolve plaintiffs' entitlement to damages nor the amount of any damage claim. *Id.* at 178.

The parties now cross-move for summary judgment on the issue of damages. Plaintiffs initially had sought recovery on theories of expectation, restitution, and reliance, but do not move now on their claim for lost profits or for restitution measured as savings to the Government caused by avoiding liquidation of Hammonton.[4] Plaintiffs, instead, move for summary judgment on alternate claims for restitution and reliance damages, seeking un-

2. The Assistance Agreement therefore also recited two merger agreements entered into by the Interim Association with Raritan and Hammonton, respectively, pursuant to which the Interim Association, and later Hansen Bancorp, succeeded to all the rights, obligations, duties, liabilities, assets, and property of those institutions.

3. The FDIC ultimately was dismissed as a party on the ground that, because any recovery by the FDIC would not exceed the amount of the Government's counterclaim, the FDIC did not present a justiciable case or controversy. *Hansen Bancorp, Inc. v. United States ("Hansen II")*, 51 Fed.Cl. 679, 681 (2002).

4. For purposes of their motion, plaintiffs maintain that these claims are foreclosed by the Federal Circuit's decision in *Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed.Cir.2001). Plaintiffs submit that *Landmark* was decided erroneously and raise these claims now only to preserve them for appeal. However, plaintiffs cannot preserve an issue for appeal without suffering a judgment. The court therefore grants defendant's motion for summary judgment on plaintiffs' claims for lost profits and restitution as measured by savings to the Government on the ground that the parties take the position that *Landmark* forecloses these claims.

der both theories to recover (1) the $1 million capital contribution; (2) professional fees incurred in preparing and performing their contractual obligations; and (3) the value of the Raritan stock exchanged. Defendant also moves for summary judgment, arguing that the terms of the Assistance Agreement bar plaintiffs from seeking recovery of any amount other than the capital contribution and that, in any event, plaintiffs' claim for Raritan stock is merely derivative of claims formerly brought by Hansen Savings through the FDIC.

## DISCUSSION

### 1. *Standards for summary judgment*

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (finding dispute to be genuine if jury could find in favor of non-moving party). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response to the other's motion, each party must provide evidence that is more than merely colorable. *See id.* at 324, 106 S.Ct. 2548 (noting evidence need not be admissible at trial); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *see also SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir.1985) (noting that non-movant must demonstrate an evidentiary conflict by more than conclusory statements or mere denials).

### 2. *Restitution and reliance damages for breach of contract*

Defendant first argues that plaintiffs cannot establish entitlement to damages because they cannot prove that passage of FIRREA caused Hansen Savings to become insolvent. A spate of documents is put forth to the effect that Hansen Savings carried a high-risk loan portfolio greatly affected by the collapse of the real estate market in 1989 and 1990; that Hansen Savings experienced losses for each year between 1987 and 1992; and that the individual plaintiffs suffered cash-flow shortages, which led them to involve Hansen Savings and Hansen Bancorp, to the detriment of those financial institutions, in transactions for the purposes of funding the individual plaintiffs' immediate short-term debt obligations.[5] Plaintiffs rejoin that the financial status of the thrift is irrelevant as a legal matter for purposes of their claims. Before addressing the merits of that contention, the court observes that the record on summary judgment includes expert opinions and deposition testimony to the effect that the thrift's capital shortfall was due solely to the passage of FIRREA, that defendant's arguments are predicated upon incorrect calculations, and that Hansen Savings could have cured any legitimate capital concerns raised by the Government but for the change in regulatory treatment. Therefore, to the extent that the financial position of the thrift is found to be relevant to plaintiffs' claims for restitution and/or reliance damages, summary judgment is inappropriate because virtually every fact involving causation is in dispute. *Cf. Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1578 (Fed.Cir.1992) (as with issue of amount of damages, causation a "classical jury question").[6]

5. Defendant also argues that plaintiffs are bound by the factual findings of the Office of Thrift Supervision's (the "OTS") regulators because plaintiffs did not challenge these findings when made and thus failed to exhaust their administrative remedies under the three-tier administrative review process set out in 12 U.S.C. §§ 1464(d)(2)(B) & (D) (2000), and applicable regulations. Under the statute, however, only the thrift was entitled and/or obligated to pursue such administrative review. Defendant does not attempt to explain how the availability of an administrative review procedure by which a

thrift may challenge its regulatory classification would bind private plaintiffs in a breach of contract action in which classification of the thrift is merely one piece of evidence relevant to a determination of contract damages or restitution.

6. The record includes two expert opinions commissioned by plaintiffs on the issue of damages. The first was performed in February 2000 by Dr. Donald Kaplan (the "Kaplan Report"). Dr. Kaplan seeks to quantify plaintiffs' total damages under theories of expectancy, restitution, and

One challenge posed by the *Winstar* cases (approximately 103 at present pending in the Court of Federal Claims) is that the case law is a product of a fractured approach to resolving the many novel legal issues that they raise. Becoming distinguished the bad way, the strategists for both plaintiffs and defendant years ago determined that the preferred course of action should be to proceed on the first group of *Winstar* cases by summary judgment on liability. Admittedly hindsight is always perfect, but one can see now that the *Winstar* case law, as it has evolved, dealt in a vacuum with liability issues that had wide-ranging implications on damages. Thus, years of decisions on liability issues contained language and even rulings with implications for the as-yet untested claims for damages. The trial courts now addressing the damages phases of these cases are proceeding deductively—piecing together the *Winstar* jurisprudence—to obtain direction on how to resolve various damages claims that derive from the same type of breach. This opinion attempts to proceed inductively by placing the *Winstar* jurisprudence on both liability and damages in the context of the basic legal principles that the decisions have drawn upon and, after attempting to harmonize these principles with the decisions, to apply the instruction of the binding precedents.

1) *Causation and the remedies of restitution and reliance*

■ The preferred remedy for contract breach is an award of expectancy damages, measured as the party's lost profits under the contract. *See Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir.2001). In limited circumstances a party alternatively may sue in restitution. Compared to an award of damages, which is implemented to put the injured party in as good a position as he would have been had the contract been performed, the purpose of restitution is to put the injured party into the position occupied before the contract was made. *Id.* (citing cases); RESTATEMENT (SECOND) OF CONTRACTS § 384 cmt. a (1981) [hereinafter RESTATEMENT]. The term "restitution" encompasses two different legal concepts. *See, e.g., Castle v. United States,* 48 Fed.Cl. 187, 215 (2000). Restitution is foremost the name given a suit in equity brought on a theory of unjust enrichment. GEORGE E. PALMER, THE LAW OF RESTITUTION § 1.1 (1978 & Supp. 1 2001). Because a party also enjoys a restitution interest in a contract, defined as his interest in having restored to him any benefit that he has conferred on the other party, restitution under appropriate circumstances also is used as a remedy in breach of contract cases. *Glendale,* 239 F.3d at 1380–81; RESTATEMENT § 344.

■ Reliance damages are similar to restitution, in that the plaintiffs seek to recover expenditures made in reliance on the contract, but differ in that a plaintiff need not show that the defendant actually benefitted from those expenditures. *Glendale,* 239 F.3d at 1382–83. Furthermore, unlike restitution, a claim for reliance damages is a claim for contract damages. "[U]nlike restitution in which the critical event that fixes the damages is when the contract was entered into, in reliance damages the critical event is the breach itself." *Id.* at 1383 (because reliance damages take into account actual loss, reliance analysis is "a more finely tuned calculation" than restitution). Therefore, like lost profits, losses claimed as reliance damages must be "foreseeable to the party in breach

---

reliance. The second was performed April 8, 2002, and quantifies the claim based on the value of Raritan stock and of the $1 million contribution. Defendant moves for summary judgment on the Kaplan Report on the ground that Dr. Kaplan admitted during deposition that he did not perform a damages analysis specific to plaintiffs as shareholders, and that "virtually all Dr. Kaplan's analyses encompass either damages purportedly sustained by [Hansen Savings], or Raritan's value." Def.'s Br. filed July 1, 2002, at 4. The predicate finding that would be the basis for summary judgment is nonetheless unclear.

The entire report need not be rejected merely because some, if not most, of the calculations include expenditures attributable to the thrift. Based on plaintiffs' response to defendant's motion, it appears that defendant moves for summary judgment on plaintiffs' claims for restitution and reliance on the ground that Dr. Kaplan gave no opinion with respect to the amounts that they now claim. To the extent that this may be the case, Dr. Kaplan does not purport to make a legal determination of entitlement to damages, nor does he opine on whether such damages properly are sought by plaintiffs.

at the time of the contract formation." *Landmark*, 256 F.3d at 1378.

As explained at length in *Westfed Holdings, Inc. v. United States*, 52 Fed.Cl. 135, 155 (2002), "[w]hen used in the context of reliance damages, the causation inquiry concerns whether the contract undertaking itself caused the expenditures or losses in question," and the burden of proof as to causation is on plaintiff. The defendant then carries the burden of proving that plaintiff would have suffered the claimed reliance damages even if the contract had been fully performed. *Id.* (discussing RESTATEMENT § 349 and stating "the injured party has a right to damages based on his reliance interest . . . less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed").[7]

Because causation is an element of proof to the award of reliance damages, plaintiffs' entitlement to such reliance damages constitutes a genuine issue of material fact to be decided at trial.

### 2) *Entitlement to restitution*

Having ruled that plaintiffs must prove causation to recover on a theory of reliance, the court now turns to plaintiffs' argument that, for purposes of a claim for restitution, a plaintiff need only show that the contract was breached.[8] Plaintiffs' position is well taken that, because a claim for restitution is not a claim for damages caused by defendant's breaching conduct, a plaintiff's financial position at the time of breach or the amount that a plaintiff stood to gain or lose under the contract are irrelevant to the measurement of its restitution interest. *See*

*Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (discussing RESTATEMENT § 373); *Castle*, 48 Fed.Cl. at 216. It therefore follows as a corollary that causation—denominated as proof of pecuniary injury from the breach—is not a necessary predicate to an award of restitution. It does not follow, however, that a plaintiff is relieved from showing no more than the fact that a breach occurred in order to establish its entitlement to an award of restitution.

In order to obtain an award of restitution, a plaintiff must make a threshold showing that it has conferred a benefit upon the defendant by way of part performance or reliance. *Glendale*, 239 F.3d at 1382 (restitution inappropriate because of failure of proof on value of benefit to Government); *Castle*, 48 Fed.Cl. at 215; *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 115 (1999); RESTATEMENT § 370. When restitution is sought in a breach of contract action, *Restatement* § 373 advises that restitution is available to a non-breaching party in circumstances of total breach or repudiation:

(1) Subject to the rule stated in Subsection (2), on a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

(2) The injured party has no right to restitution if he has performed all of his duties under the contract and no performance by the other party remains due other than

---

7. Plaintiffs thus correctly assert that, under a theory of reliance, they need prove no more than that the contract was breached and that the expenditures in question were foreseeable. However, in their responsive brief, plaintiffs imply that the causation inquiry is irrelevant to an award of reliance damages. This implication is belied by plaintiffs' earlier brief in which they recognize that "[g]iven the facts of a particular case, the causation requirement could significantly alter the nature of reliance damages as compared to restitution damages." Pls.' Br. filed May 15, 2002, ¶ 32.

8. One bringing a cause of action for unjust enrichment need not prove causation in that recovery does not depend upon a finding of wrongful conduct by the defendant. *Winstar* plaintiffs cannot bring such substantive claims for restitution because claims for unjust enrichment are not within the court's jurisdiction. *E.g., Westfed Holdings*, 52 Fed.Cl. at 149; *Centex Corp. v. United States*, 49 Fed.Cl. 691, 712 (2001). An award of restitution may be made by this court only as incident to a claim for breach of contract. *Collins v. United States*, 209 Ct.Cl. 413, 424–25, 532 F.2d 1344, 1351 (1976).

**100**

payment of a definite sum of money for that performance.

If "the breach is by non-performance, restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." *Id.* § 373 cmt. a.; *see also* PALMER, *supra*, § 4.5 (discussing "necessity and sufficiency of an essential breach" as predicate to award of restitution).

 Repudiation is a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach." *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423 (quoting RESTATEMENT § 250).[9] Restatement § 243 intones:

(1) [A] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance....

(2) Except as stated in Subsection (3), a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach.

(3) Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.

(4) In any case other than those stated in the preceding subsections, a breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured part at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.

The term "total breach" is not a term of art. Awards of restitution often are predicated on findings of "substantial" or "essential" breach, as well. *See* 1 PALMER, *supra* at 409; *e.g., Mobil Oil,* 530 U.S. at 621, 120 S.Ct. 2423 (total breach analyzed as "substantial" breach); *Northern Heel Corp. v. Compo Indus.,* 851 F.2d 456, 460 (1st Cir. 1988) (breach by other party must be "total," striking the "essence" of the contract). The determination of total breach is made "in the light of all the circumstances, taking account of the difficulty of calculating damages for total breach and of any uncertainties that could be avoided if the injured party were given a claim merely for damages for partial breach." RESTATEMENT § 243 cmt. e; *cf. Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992) (materiality of breach determined by totality of events and circumstances).

 In the absence of repudiation or total breach, restitution also is available to compensate a party for part performance or reliance when a contract is voidable due to lack of capacity, mistake, misrepresentation, duress, undue influence, or abuse of a fiduciary relation or in cases of impracticability, frustration of purpose, or non-occurrence of a condition. RESTATEMENT §§ 376–77. Finally, as a practical matter, a court may award restitution as a remedy for breach of contract in the absence of a showing of total breach or voidability in circumstances where the plaintiff has sought damages for the breach, but those damages are found too speculative to be recovered. *E.g., Glendale,* 239 F.3d at 1380 (explaining that as to lost profits, "the proof problems can in some situations prove to be insurmountable," and that "[w]hen proof of expectancy damages fails, the law provides a fall-back position for the injured party—he can sue for restitution"); *CBS, Inc. v. Merrick,* 716 F.2d 1292, 1296–97 (9th

**9.** Compared to breach of contract, which is the "[f]ailure of the promisor to perform at the time indicated for performance in the contract ... the promisor's renunciation of 'a contractual duty *before* the time fixed in the contract for ... performance' is ·a repudiation." *Franconia Assocs. v. United States,* 536 U.S. 129, 122 S.Ct. 1993, 2002, 153 L.Ed.2d 132 (2002) (quoting 4 A. CORBIN, CONTRACTS § 959, p. 855 (1951), and citing

RESTATEMENT §§ 235(c) & 250). Having established a repudiation, a plaintiff may immediately sue and, having not fully performed the contract itself, may sue in restitution in order to undo the contract and be restored to its pre-contract position. *See id.; Kasarsky v. MSPB,* 296 F.3d 1331, 1336 (Fed Cir.2002) (plaintiff may elect immediately to sue upon repudiation or wait until actual breach occurs).

Cir.1983) (Nelson, J., concurring) ("[A] plaintiff may request restitution in a breach of contract action as a substitute measure of lost profits where, as here, the true measure of lost profits would be purely speculative."). In other words, "inadequacy of the damage remedy may persuade the court to grant restitution when it otherwise would be refused." PALMER, *supra*, at 427–28.

In short, though an injured party need not make a showing of "causation" or "injury"—defined as harm by the breach—that party must make a predicate showing that the character of the breach is such as to entitle him to restitution. *See, e.g., Mobil Oil*, 530 U.S. at 614–24, 120 S.Ct. 2423 (analyzing whether breach occurred and, if so, whether breach could be characterized as repudiation or total breach so as to justify an award of restitution); *Tangfeldt Wood Prods., Inc. v. United States*, 733 F.2d 1574, 1576 (Fed.Cir. 1984) (whether catastrophe termination was effectively termination for impracticability of performance so as to entitle plaintiff restitution); *Westfed Holdings*, 52 Fed.Cl. at 150–152 (discussing restitution under theories of frustration, impossibility, and mutual mistake).

Plaintiffs' argument that restitution is available merely upon a showing of breach bespeaks a misreading of the Supreme Court's decision in *Mobil Oil*. The Supreme Court held that the measure of restitution for a breach of contract properly was the cost of the plaintiffs' performance, defined as moneys given by the plaintiffs to the defendant pursuant to the contract. 530 U.S. at 608, 120 S.Ct. 2423 (as restitution, "the Government must give the [plaintiffs] their money back"). The claim for restitution in *Mobil Oil*, however, was predicated upon the Government's repudiation of the plaintiffs' lease contracts. *Id.* at 607, 120 S.Ct. 2423. Indeed, in setting forth the standards of restitution, the Supreme Court did no more than present the *Restatement* position that restitution is an appropriate remedy in circumstances where a contract has been repudiated or has been totally breached. *Id.* at 607–08, 120 S.Ct. 2423. That the findings of repudiation and total breach were prerequisites to

the award of restitution in *Mobil Oil* is confirmed by the fact that after ruling that the Government breached the lease agreements by virtue of the passage of a regulation, *id.* at 617–18, 120 S.Ct. 2423, the Court examined in depth the issue of whether the breach could be characterized as repudiation or total breach so as to justify an award of restitution, *id.* at 620–21, 120 S.Ct. 2423. The Court characterized the passage of the regulation as a statement of repudiation. Moreover, because that repudiation closed the "gateway" to the plaintiffs' enjoyment of all their other contract rights, "[t]he breach was 'substantial,' depriving the companies of the benefit of their bargain" and entitling them to restitution as described in *Restatement* § 243. *Id.* at 621, 120 S.Ct. 2423. That the finding of a substantial breach was the necessary predicate to the award of restitution is corroborated further by the dissent, which agreed to the basic factual findings of the majority, while disagreeing that the breach properly could be characterized as substantial. *Id.* at 633–39, 120 S.Ct. 2423 (Stevens, J., dissenting).

Under the law of restitution, plaintiffs in this case have a choice in fashioning their burden of proof. They may attempt, as in *Mobil Oil*, to prove repudiation, total breach, or the existence of a voidable contract and thus avoid the inquiry into causation. Alternatively, they may put on a case for expectation damages, including a showing of causation. *See, e.g., Suess v. United States*, 52 Fed.Cl. 221, 230–31 (2002) (because award of expectancy damages requires showing that passage of FIRREA was substantial factor in thrift's demise, plaintiff who claims restitution and also shows passage of FIRREA was substantial factor in thrift's demise will prevail on the claim).

3. *Impact of the Federal Circuit's decision in Landmark on plaintiffs' entitlement to restitution.*

Plaintiffs argue that they are not required to establish entitlement to restitution because the Federal Circuit in *Landmark* already ruled in favor of such entitlement.[10]

---

10. With the exception of *Landmark*, published *Winstar* damages decisions all involved claims

To the extent that plaintiffs maintain that the Federal Circuit in *Landmark* held that any *Winstar* plaintiff with a judgment of liability in hand is entitled to restitution, such an assertion cannot be supported. The Federal Circuit has approached *Winstar* damages on a case-by-case basis and has neither foreclosed nor endorsed any particular damages theory. *See, e.g., Bluebonnet Savings Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355–56 (Fed.Cir.2001) (affirming award of narrowly defined expectation damages); *Glass,* 258 F.3d at 1350 (saying nothing about trial court's award of expectancy damages to shareholders); *Glendale,* 239 F.3d at 1383–84 (approving award of restitution and reliance damages on ground that plaintiff failed to prove expectation damages). Furthermore, *Landmark* properly cannot be construed as a wholesale endorsement of the award of restitution. Compared with *Glendale,* the legal basis for the award of restitution in *Landmark* is unknown. The *Landmark* trial opinion discloses only that "[t]estimony at trial established that Landmark was entitled to restitution for the assets that it contributed." *Landmark Land Co. v. United States,* 46 Fed.Cl. 261, 264 (2000). The legal issue with respect to restitution on appeal was whether the measure of restitution properly was awarded as the cost of plaintiff's performance, defined as contributions made pursuant to an assistance agreement. The Federal Circuit held only that, under the measure applied in *Mobil Oil,* it was. *Landmark,* 256 F.3d at 1372–73.

Neither the trial judge nor the Federal Circuit in *Landmark* made any express statement about plaintiffs' burden as to proving entitlement to restitution.[11] Because the legal basis for the award of restitution in *Landmark* is unknown, plaintiffs cannot argue successfully that the facts of this case are sufficiently similar to those in *Landmark* as to justify the same result on their motion for summary judgment. Moreover, nothing in the Federal Circuit's opinion justifies imputing to that decision the implicit expansion of *Winstar* from a finding that FIRREA caused the breach of applicable assistance agreements to one that FIRREA caused a repudiation or total breach of those agreements. The mere fact that the Federal Circuit adopted *Mobil Oil's* measure of restitution fails to establish that the Federal Circuit intended to announce that the change in regulatory treatment constituted a total breach of every assistance agreement entered into by *Winstar* plaintiffs.

### 4. *Winstar and total breach*

Although the court has rejected plaintiffs' argument that *Landmark,* standing alone, supports the proposition that plaintiffs are entitled to an award of restitution, *Landmark* is not the paradigm of *Winstar*-related litigation. As the instant motions demonstrate, the *Winstar* litigation suffers from the lack of any template. The result is that common issues must be relitigated in each case. Moreover, the numerous decisions on

for lost profits by a solvent thrift or the FDIC as the thrift's representative and/or a claim for expectancy damages by former shareholders, so evidence was presented as to the financial status of the thrift at the time of the breach as part of those claims. As a result, any discussion of restitution followed a finding of causation, and the respective trial judges did not have occasion to discuss the availability of restitution in the absence of a finding of causation. *See Suess,* 52 Fed.Cl. at 225–230; *Castle,* 48 Fed.Cl. at 199–217; *Glass v. United States,* 47 Fed.Cl. 316, 321–31 (2000), *rev'd in part,* 258 F.3d 1349 (Fed.Cir. 2001); *LaSalle Talman,* 45 Fed.Cl. at 77–112 (1999); *Cal. Fed. Bank v. United States,* 43 Fed. Cl. 445, 449–61 (1999), *aff'd in part,* 245 F.3d 1342 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390, 395–402 (1999); *see also Citizens Fed. Bank, FSB v. United States,* 52 Fed.Cl. 561, 563–67 (2002) (discussing damages in context of summary judgment).

11. It is true that the *Landmark* trial court opinion mentioned the plaintiff's burden of proving causation with-respect to its claim for reliance damages. *See* 46 Fed.Cl. at 266, 270. With respect to restitution, however, the opinion offers only the definition of restitution as the return of benefits conferred "on the other party by way of part performance or reliance" and then explains the measurement of such restitution. *Id.* The absence of any analysis of entitlement and causation could support the inference that the trial judge did not hold plaintiffs to a showing of entitlement to restitution as envisioned in the *Restatement* and cases such as *Mobil Oil.* To the extent that the *Landmark* trial opinion fairly can be read to support the proposition that a plaintiff need not characterize the breach in a manner proving entitlement to restitution, this court respectfully disagrees.

summary judgment have led to piecemeal decisions on, for example, the proper measure of damages or the standing of the FDIC, in the absence of a unified theory of the wrong committed by the Government. Given the tortuous history of the *Winstar* cases, before requiring plaintiffs to revisit the issue of liability so that a determination of total breach can be made, it is incumbent upon the court to review the *Winstar* bibliography for clues as to whether an answer may lie in the case law.

▅▅▅ In order to avoid proving causation, plaintiffs must establish that the Office of Thrift Supervision's (the "OTS") regulations constituted a total breach of the Assistance Agreement. As discussed in *Mobil Oil*, "a breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured party at the time of the breach that *it* is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." RESTATEMENT § 243(4), *quoted in Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423. The assessment is not made based on the actual, ultimate impact of the breach and supervening events, but, rather, on the impact on a plaintiff's contractual rights at the time of the breach. *Mobil Oil*, 530 U.S. at 609, 621, 120 S.Ct. 2423; *see also Stone Forest*, 973 F.2d at 1552–53 (breach of severable portion of divisible contract does not give rise to claim for total or material breach); *Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 263, 512 F.2d 1082, 1093–94 (1975) (breach that deprived plaintiff of 6.5% of total contract not total breach

when plaintiff already received 93.5% of bargained-for benefit).

▅▅▅ Although this court heretofore has not been called upon to characterize the Government's breach, it nevertheless has found that the supervisory goodwill promise was "essential" to that agreement. *Hansen I*, 49 Fed.Cl. at 171. Similarly, although the Supreme Court in *Winstar* did not have occasion to characterize the breach according to any particular damages theory, it also held that goodwill treatment was "essential to supervisory merger transactions of the type at issue in [that] case." *United States v. Winstar Corp.*, 518 U.S. 839, 849, 116 S.Ct. 2432, 135 L.Ed.2d 964; *see also id.* at 850 n. 6, 116 S.Ct. 2432 (citing Congressional Record statements that goodwill was "inducement to the healthy savings and loans to merge with the sick ones," and that "regulators 'looked at [supervisory goodwill] as kind of the engine that made this transaction go. Because without it, there wouldn't have been any train pulling out of the station, so to speak' "). Further, "[t]his treatment was, of course, critical to make the transaction possible in the first place, because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory net worth." *Id.* at 850, 116 S.Ct. 2432.

*Winstar* held that the repudiation of the supervisory goodwill promise breached an express agreement to allow such goodwill, or, at least, to carry the risk of loss with respect to the plaintiffs' goodwill accounting treatment.[12] The result of the Government's re-

---

**12.** This court already has held that the Government is liable for breach of the Assistance Agreement, whereas the legal issue for purposes of plaintiffs' claim to restitution is how to characterize that breach. A brief recapitulation of the Supreme Court's opinion in *Winstar* therefore is appropriate. The plurality in *Winstar* repeatedly characterized supervisory goodwill promises as guarantees against loss. In determining that the unmistakability doctrine did not apply, the plurality in *Winstar* emphasized that a promise to account for supervisory transactions in a particular manner is a promise to bear the risk of regulatory change in the regulations instead of a promise not to change the regulations:

"We read this promise as the law of contracts has always treated promises to provide some-

thing beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence." *Winstar*, 518 U.S. at 868–69, 116 S.Ct. 2432. "The plurality, however, conceded that performance of the Government's promise require[d] exercise (or not) of a power peculiar to the Government." *Id.* at 880, 116 S.Ct. 2432; *see also id.* at 929–30, 116 S.Ct. 2432 (Rehnquist, C.J., dissenting) (noting tension between plurality's characterization of promise as insuring thrifts against loss and plurality's conclusion that FHLBB and FSLIC " 'were contractually bound to recognize the supervisory goodwill and the amortization periods reflected' in the agreements between the parties"). Moreover, five members of the Court proceeded on

pudiation of goodwill accounting treatment was substantial and devastating, characterized by the Court as "swift and severe." *Id.* at 857, 116 S.Ct. 2432. Indeed, the Court observed that Congress's express intent in passing FIRREA was to "abrogate" or "renege" on the contracts entered into by FSLIC. *Id.* at 900–01 & n. 47, 116 S.Ct. 2432. FIRREA "had the substantial effect of releasing the Government from its own contractual obligations." *Id.* at 902, 116 S.Ct. 2432. The Federal Circuit also has described the contractual obligation of goodwill accounting treatment as one of "substantial value" for plaintiffs. *Glendale,* 239 F.3d at 1381–82; *see also Cal.Fed.,* 245 F.3d at 1351. Although eschewing the term "total" or "substantial" breach, the Supreme Court and Federal Circuit in *Winstar* effectively ruled that the Government abrogated its responsibility to allow supervisory goodwill, that this abrogation made it impossible for the Government to perform its duty under the contract, and that the Government thereby breached the "essential" or "critical" provision of the assistance agreements.[13] The court therefore concludes that the Government's conduct in this case constituted a total breach of the Assistance Agreement.

### 5. Plaintiffs' contributions to the Assistance Agreement

The court now turns to plaintiffs' claim for restitution. The Federal Circuit has held that, even in the case of an insolvent thrift, *Winstar* plaintiffs conferred a benefit upon the Government because the Government no longer was responsible for the ailing thrift for at least a period of time. *Glendale,* 239 F.3d at 1382. The legal problem until *Landmark* thus became how to quantify that benefit. *See id.; LaSalle Talman,* 45 Fed.Cl. at 77–112. Although the award of restitution in *Glendale* was predicated on the shareholders' failure at trial to prove expectancy damages,

the Federal Circuit's finding that the assistance agreements conferred a benefit upon the Government also supports the threshold ruling on a claim for restitution. In addition, the facts presented in *Glendale,* whereby a private party took a failing thrift from the responsibility of FSLIC via an assistance agreement, are not unique to that case. The Federal Circuit's statements regarding the benefit to the Government are applicable in any *Winstar* case in which a plaintiff expressly agreed to relieve FSLIC of an ailing thrift.

In the context of a *Winstar* case, the Federal Circuit has determined that the restitution remedy properly is measured as the plaintiffs' cost of performance, defined as plaintiffs' contributions under the Assistance Agreement. *Landmark,* 256 F.3d at 1372–73; *see also Mobil Oil,* 530 U.S. at 608, 120 S.Ct. 2423. It is not enough that a contribution be made to effectuate the "spirit" of the contract; the contribution must be an express contractual requirement. *Landmark,* 256 F.3d at 1375. "[R]estitution is not owing" to a party who "performed the work for its own purposes and convenience." *Tangfeldt,* 733 F.2d at 1577.

#### 1) $1 million capital contribution

■ Under section 2(b)(5) of the Assistance Agreement, plaintiffs were required to make a $1 million capital contribution to the transaction. The parties do not dispute that the capital contribution was one required expressly by the Assistance Agreement nor that plaintiffs satisfied the condition. Plaintiffs therefore are entitled to summary judgment in their favor on their claim for a return of the $1 million capital contribution as restitution for the Government's breach.

#### 2) Raritan stock

■ Defendant presents several arguments to the effect that plaintiffs cannot lay

---

the understanding that the operative promise at issue was a promise to regulate in a certain manner. *See id.* at 919–20, 116 S.Ct. 2432 (Scalia, J., concurring); *id.* at 929–30, 116 S.Ct. 2432 (Rehnquist, C.J., dissenting); *see also Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 637, 640–42 (2002).

**13.** The court observes that not all *Winstar*-related cases are identical. In those cases involving assistance agreements with respect to which supervisory goodwill was essential, total breach can be predicated upon the case law developed to date. The court expresses no opinion on the nature of the breach in a non-assisted transaction.

claim to the value of Raritan stock exchanged for shares of Hansen Bancorp.[14] It first re-raises the argument that any such claim contravenes plaintiffs' rights and obligations under the Assistance Agreement. In *Hansen I* defendant argued that plaintiffs lacked standing because plaintiffs had waived any claim to damages by operation of section 29 of the Assistance Agreement entitled "Limitation With Respect to Investors." 49 Fed. Cl. at 174. That provision reads:

> The INVESTORS have executed this Agreement solely to the extent of their covenants provided in §§ 15, 16(a), (c), (d) and (e) and in connection with their obligations under §§ 2(b)(5), 7, 8, 19, 21(c) and 24 and only to the extent of such liabilities that may arise in connection with such provisions.

The court already has ruled that this provision is not a bar on claims by plaintiffs for breach of contract; rather, it limits their liability to those damages predicated on their rights and duties under those enumerated sections. *Id.* at 174–75. Nothing in this provision suggests that plaintiffs agreed not to bring claims against the Government.

Section 29 does reveal, however, that the Assistance Agreement lacks an express requirement that plaintiffs contribute Raritan stock. Plaintiffs' only express contribution was the $1 million capital contribution under section 2(b)(5). *See id.* (explaining obligations referenced in section 29). Plaintiffs' obligations as to the Raritan stock, instead, are found in the FHLBB Resolution, which states:

> [Hansen Bancorp], pursuant to applicable law, shall exchange shares of [its] common stock for all of the issued and outstanding capital stock of [the Florida Bank] owned by [plaintiffs] and subsequently shall purchase all of the issued and outstanding capital stock of [Interim Association] and subsequently, after the [Interim Association] Merger and through the Merger, in accordance with New Jersey law, shall exchange shares of [Hansen Bancorp's] common stock for all of the issued and outstanding capital stock of Raritan owned by [plaintiffs], plus one million dollars ($1,000,000) which [Hansen Bancorp] shall infuse into Raritan in accordance with the Assistance Agreement and after completion of the transactions described in this paragraph....

The court already has found that the conditions of approval recited in the FHLBB Resolution were incorporated by reference into the Assistance Agreement. *Hansen I,* 49 Fed.Cl. at 170. This incorporation occurred through section 24(a), a provision expressly referenced in section 29.[15]

---

**14.** Defendant advances a rather confusing argument that plaintiffs cannot claim the value of Raritan stock because, under the Assistance Agreement, only Raritan contributed the value of Raritan. It is tree that only Raritan contributed the value of itself to the merger. *See Landmark,* 256 F.3d at 1377–78 (assets in thrift's hands contributed by thrift). It is also true that plaintiffs may not bring claims properly brought by Raritan. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 547–48, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (shareholders may bring claims in equity for restitution only through mechanism of derivative suit against corporation); *Kanehl v. United States,* 38 Fed.Cl. 89, 100–01 (1997) (shareholders not in privity with contracts of corporation and cannot sue on those contracts). Defendant, however, does not dispute that plaintiffs actually owned all of Raritan's stock prior to the merger. *See* N.J.Stat.Ann § 14A:7–12(1) (2002) ("The shares of a corporation shall be personal property....")

Defendant's assertion that Raritan contributed its own stock to the Assistance Agreement lacks the foundational explanation of how Raritan could somehow lay claim to that stock. The Assistance Agreement did not require Raritan to re-acquire and contribute the value of outstanding stock. Because the individual plaintiffs owned their stock in Raritan as personal property and because they did not give that stock to Raritan before the merger, but, instead, exchanged it contemporaneous with the merger pursuant to agreements to which they were parties, it cannot be said that a claim for the return of the stock's value, whether as a claim for restitution or otherwise, is a claim that only could be brought by Raritan. The court already has held that plaintiffs, as signatories to the Assistance Agreement, are entitled to claim the value of what they contributed to that agreement. *See Hansen I,* 49 Fed.Cl. at 173–74. The sole issue for purposes of defendant's motion, therefore, is whether the Assistance Agreement obligated plaintiffs to contribute that stock.

**15.** Section 24(a) provides:

This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements

The legal issue becomes whether, as a matter of law, FHLBB's requirement that plaintiffs exchange their stock in Raritan constitutes a contribution of that stock under the Assistance Agreement. The court holds that it did not. The court has no basis to find that the exchange of stock was a transaction that caused either a loss to plaintiffs or a benefit to defendant. Under the tax code, for example, "[n]o gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." 26 U.S.C. § 354(a) (2000); *e.g., Comm'r v. Clark,* 489 U.S. 726, 729–30, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989) (shareholder who exchanges stock during merger does not enter a taxable transaction, but shareholder who agrees with acquiring corporation to sell stock to that corporation for cash experiences a capital gain); *Clark v. Comm'r,* 828 F.2d 221, 222–23 (4th Cir.1987) (discussing tax consequences when shareholder exchanged all.shares of acquired corporation's stock for fewer shares of acquiring corporation plus cash payment of $3,250,000.00).

Plaintiffs present no evidence, and do not argue, that the exchange created a value, let alone whether the value effectively was contributed to the Assistance Agreement. Plaintiffs' experts opine only as to the value of the Raritan stock at the time of the merger, a value that was unchanged by the exchange. Of equal importance, plaintiffs' shares of stock in Raritan were not exchanged for shares in Hansen Savings, but for shares in Hansen Bancorp. Plaintiffs have at all times maintained ownership of Hansen Bancorp as its sole shareholders. Any claim for the loss of Raritan's value thus is actually a claim for the loss of value of Hansen Bancorp's shares. Such a claim is not a claim for restitution, but a claim for loss of share value as the consequential damages of defendant's breach. Because the exchange fairly cannot be characterized as a cost to the individual plaintiffs, recovery under either a theory of restitution or reliance is inappropriate.

That the exchange of Raritan stock was not a contribution per the Assistance Agreement is supported by the plain language of the FHLBB Resolution. That document merely recites plaintiffs' pre-existing legal obligation under New Jersey law to exchange shares in the existing corporation for those in the merged corporation. *See* N.J.STAT.ANN. §§ 14A:10–3(1)(b) & 6(b) (discussing shares in holding companies); *e.g., Casey v. Brennan,* 344 N.J.Super. 83, 780 A.2d 553, 567–68 (Ct.App.Div.2001) (discussing rights of dissenting shareholders who do not want to exchange shares). Plaintiffs were required to exchange the stock regardless of whether the FHLBB Resolution recited that obligation as a condition of approval. The mere performance of the exchange did not vest plaintiffs with enforceable contract rights. *See Glass,* 258 F.3d at 1354 (fact that shareholders exchanged stock pursuant to merger agreement cannot vest shareholders with rights as third-party beneficiaries).

Because the Assistance Agreement did not impose on the individual plaintiffs more obligations or confer on them more rights as to the exchange of stock than those stipulated by New Jersey law, the value of the Raritan stock exchanged cannot be recovered. As explained by the Federal Circuit, plaintiffs' recovery in restitution is limited to those express contributions required by the assistance agreement. *Landmark,* 256 F.3d at 1375–77. Consequently, in *Landmark,* the plaintiff could not recover what was an undisputed, but unrequired, contribution of all its assets to the thrift. Although the agreement in *Landmark* required the plaintiff to make additional contributions as necessary to maintain the thrift's net worth, the facts established that the contribution was not made for this purpose. *Id.* at 1374–75. As such, the contribution was not made in performance of the contract and was not recoverable as restitution, even if undisputably made within the "spirit" of that contract. *Id.* at 1375.

and understandings of the parties in connection with it, excepting only any resolutions or letters

issued contemporaneously with this Agreement by the Bank Board....

In the instant case, once the corporation legally agreed to a merger, plaintiffs as shareholders legally were required either to cash in their shares or to exchange them for equivalent shares in the merged entity, and the Assistance Agreement merely recites this duty. Plaintiffs cite to no provision in the Assistance Agreement or any of the documents incorporated by reference that mandates a different result with respect to plaintiffs' exchange of Raritan stock. Nor do plaintiffs cite any authority for the proposition that a shareholder's pre-existing legal duties become compensable as restitution merely because of their recital in a contract or approval document. Indeed, the actual merger and the conditions of the transfer were made in the Merger Agreement between Raritan and Hammonton, to which plaintiffs were not parties. That Merger Agreement expressly disavowed conferring non-parties with such rights.[16]

Plaintiffs argue only that this court already decided in *Hansen I* that plaintiffs were not merely ordinary shareholders. In making a determination of plaintiffs' standing, this court, indeed, found that plaintiffs were not ordinary shareholders because they were afforded rights and duties as signatories to the Assistance Agreement. *Hansen I*, 49 Fed.Cl. at 174–75. Although plaintiffs have standing because some of their obligations were beyond those of ordinary shareholders, it does not follow that no obligation was that of an ordinary shareholder. The individual plaintiffs' compliance with FHLBB's requirement that they exchange Raritan stock for that of Hansen Bancorp in accordance with New Jersey law did not confer on them, as shareholders, the right to seek the value of the stock exchanged as restitution.

Having found that plaintiffs cannot lay claim to the value of the Raritan stock, the court need not address the parties' arguments as to the value of that stock. In any case, the parties vigorously dispute not only the value of the stock, but whether any expert analysis conducted in this case fairly can be said to have evaluated the stock's value. As such, a genuine issue of material fact exists as to the value of the Raritan stock and the court would be precluded from finding in either party's favor had the issue survived.

### 3) *Professional fees and miscellaneous expenses*

■ Plaintiffs seek an unspecified amount for professional fees and miscellaneous expenses incurred in preparing for and performing their contractual obligations. While such fees may have been incurred incident to, and may have been a practical necessity for, the Assistance Agreement, the fees were not an obligation of plaintiffs under the Assistance Agreement and thus cannot be recoverable as restitution. It is well-established that expenses incurred in preparation for performance or in performance properly are characterized as reliance damages. *Glendale*, 239 F.3d at 1383; RESTATEMENT § 349.

### 7. *Offsets to the award of restitution*

■ "Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated." *Landmark*, 256 F.3d at 1373; *see also* RESTATEMENT § 384 cmt. a ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party."). Defendant argues that any award to plaintiffs be offset by the $1.2 million dividend paid to plaintiffs one year after the merger. The Federal Circuit in *Landmark* expressly rejected this argument. The trial court found that no offset was required be-

---

16. Section 18 of the merger agreement provides:
 *Sole Benefit.* Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than [Raritan] or [Interim Association] any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions, it being the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of [Raritan] and [Interim Association] and for the benefit of no other person.

cause the Government was not responsible for paying the dividend, a finding affirmed by the Federal Circuit:

> The government has not shown this finding to be clearly erroneous. The government's actions were simply not relevant to the dividends, which were generated as a result of Landmark's performance under the contract in managing [the thrift]. Thus, because the government was not responsible for the dividends paid by [the thrift] to Landmark, offset would not be proper.

256 F.3d at 1373–74. Defendant attempts to distinguish *Landmark* on the ground that the dividend paid to plaintiffs in this case was "directly attributable to the merger." Def.'s Br. filed July 1, 2002, at 12. As a basis for this finding, defendant argues that prior to the merger, Raritan was losing money and unable to pay dividends. The dividend became feasible through Hansen Savings's accounting of Hammonton's covered assets and thus presumptively is attributable to the merger. This argument, however, ignores the Federal Circuit's determination that, regardless of what defendant proved at trial, the "government's actions were simply not relevant to the dividends." The Government did not bestow upon plaintiffs $1.2 million, and the court cannot divine how the mere fact that the transaction subsequently enabled Hansen Savings to issue a dividend translates into the legal conclusion that the dividend was a benefit plaintiffs received from the Government under the contract. Defendant's motion for summary judgment as to whether the dividend be included as an offset to plaintiffs' recovery in restitution is denied. Plaintiffs' cross-motion on point is granted.

### 8. *Reliance damages*

The court already has held that plaintiffs' claim to recover expenditures not expressly required by the Assistance Agreement must be sought on a theory of reliance. It has also ruled that the issue of causation, determinative of whether any reductions to plaintiffs' award of reliance damages is necessary, is a genuine issue of material fact to be proved at trial by defendant. Plaintiffs have identified the following disputed causation issues to be decided at trial: (1) whether OTS regulators properly evaluated Hansen Savings; (2) whether the restrictions placed upon the bank impeded the bank from making virtually any loan, thereby preventing it from increasing its revenues; (3) whether the Government's conduct reduced the bank's loan-to-one-borrower ratio; (4) whether the Government was justified in reducing the thrift's rating from four to five; and (5) whether the Government's failure to honor its contractual obligations was the linchpin of its refusal to approve the thrift's capital plans and whether those capital plans would have cured any legitimate capital concerns of the Government. The court is inclined to rule that the foregoing will define the parameters of admissible evidence. In its pre-trial brief, defendant shall state its position and may suggest any other issues that relate to its burden on causation.

The court now addresses the parties' arguments as to whether plaintiffs legally can recover any of the above expenditures as reliance damages. "The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract.'" *Landmark*, 256 F.3d at 1378 (quoting RESTATEMENT § 344(b)); *Glendale*, 239 F.3d at 1382–83 (explaining that "[r]eliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach"). To recover reliance damages, plaintiffs' loss or expenditures must have been foreseeable to the party in breach at the time of contract formation. *Landmark*, 256 F.3d at 1378 (explaining that both the magnitude and type of loss must be foreseeable to a prudent man). Any particular loss may be foreseeable because it follows from the breach in "the ordinary course of events" or "as a result of special circumstances, beyond the ordinary course of events," that "the party in breach has reason to know." *Id.* (quoting RESTATEMENT § 351(2)).

#### 1) *Professional fees*

By their motion for summary judgment, plaintiffs seek an unspecified amount for professional fees, indicating that entitlement to

these fees and their amount will be established at trial. Defendant raises no objection, and the court therefore does not rule as to plaintiffs' claim for professional fees at this time.

### 2) *Other reliance damages*

Plaintiffs assert that they also are entitled to an amount of $1.9 million in "miscellaneous" expenses, plus an unspecified amount in interest and penalties related to plaintiffs' default on loans identified as the "Midlantic loans." With respect to the miscellaneous expenses, plaintiffs with one exception provide neither documentation nor an explanation concerning the nature of these expenses.

### i) *Management expenses*

■ According to plaintiffs' opposition briefs, an unspecified portion of these expenses is attributable to plaintiffs' assumption of Hansen Savings's management expenses. Plaintiffs provide personal tax returns to prove the expenditures were made and a February 15, 1989 OTS examination report to prove such expenditures were known to the Government and thus foreseeable. Plaintiffs do not explain how these documents support these conclusions.[17] *See RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1079 (4th Cir.1982) (plaintiff failed burden of proof as to reliance damages; plaintiff failed to provide any evidence of specific expenditures in reliance and tax returns and audit reports submitted failed to distinguish relevant expenditures).[18] Even assuming that the expenditures were made and with

the Government's knowledge, plaintiffs are not entitled as a matter of fact or law to a finding that these expenditures were made in reliance on the transaction. The Assistance Agreement did not mandate that plaintiffs incur the thrift's management expenditures, nor did it mandate any particular management structure. In any case, plaintiffs' brief is devoid of any showing that these expenditures were incurred in the course of performing their duties under the Assistance Agreement. Expenditures made for business reasons unrelated to any duty of performance under the Assistance Agreement are not recoverable as reliance damages. *Landmark*, 256 F.3d at 1375; *Tangfeldt*, 733 F.2d at 1577.

Plaintiffs' claim apparently assumes that the thrift's ordinary management costs became expenses incurred solely in reliance on the transaction with the Government merely because the institution came into existence by virtue of the transaction. This assumption is totally unsupported and untenable. While management operations certainly are necessary for the performance of the thrift as a lending institution, plaintiffs overreach in positing that management operations were required for performance of the completed merger agreement. This result does not change merely because the Government had an ongoing duty to recognize the thrift's goodwill accounting methods. Even if the thrift necessarily incurred management expenses in the course of its performance of the Assistance Agreement, such a claim

---

**17.** According to defendant, plaintiffs only recently provided documents heretofore unproduced or unreferenced in this litigation, and no depositions have been conducted regarding their contents. These documents do not accompany plaintiffs' motion for summary judgment. Defendant makes no argument about these expenditures, and the court makes no rulings thereon. Resolution of defendant's pending motion to compel production of these documents will not affect the ruling on the instant dispositive motions. Defendant initially moved for summary judgment on the ground that plaintiffs had no documentation for these costs beyond the Kaplan Report and that the Kaplan Report legally was insufficient to substantiate the costs referenced therein. Defendant now has received documents but is "unable at this time to assess this component of plaintiffs' claim." Def.'s Br. filed July 1,

2002, at 13 n. 7. The court therefore makes a partial finding in defendant's favor that the Kaplan Report alone cannot substantiate plaintiffs' claimed costs.

**18.** The tax returns, Schedule C Profit or (Loss) From Business or Profession for the years 1987–1992, include a line item for wages paid, but the tax return, filed by an entity named Hansen Financial, fails to specify that these wages were paid to the employees of any thrift, let alone whether they were paid to the management of Hansen Savings. For its part, the OTS examination report reflects only that the regulators recognized that four of Hansen Savings's directors were also directors of Hansen Bancorp's other subsidiary, the Florida Bank.

would belong to the thrift. Plaintiffs do not attempt to explain how the Government would foresee their personal assumption of these expenses on behalf of the thrift. Plaintiffs' motion for summary judgment on this issue is denied.

### ii) *The Midlantic loans*

██ Plaintiffs next claim losses incurred when they defaulted on the Midlantic loans. Once again they are silent as to how these loans reflect reliance on the Assistance Agreement. According to documents in the record, plaintiffs borrowed approximately $13 million in 1986 from the Midlantic Bank to acquire Raritan and the Florida Bank. They borrowed an additional $3.5 million in March 1988, $2.5 million of which was used to increase their stock ownership in the Florida Bank. The only connection to the subsequent Assistance Agreement is found in a memorandum dated May 12, 1988, in which OTS regulators acknowledged the loans. They also noted, however, that although the loans were collateralized with Raritan and Florida Bank stock, they were "expected to be repaid from funds generated from the operations of other enterprises owned by the Hansens" and not by Hansen Bancorp. Plaintiffs counter that OTS regulators, to the contrary, were aware that Hansen Bancorp was expected to contribute to reductions of this debt. Plaintiffs reference Bates-stamped documents not attached to their motion and not before the court. In any case, Hansen Bancorp subsequently applied for and received permission from OTS regulators to assume the Midlantic debt sometime in September 1988. On February 2, 1989, plaintiffs executed an Amended and Restated Loan Agreement and at that time pledged Hansen Bancorp stock as security. Plaintiffs defaulted on that loan, and on January 26, 1993, a judgment was entered against plaintiffs. An interest penalty was part of that judgment, and it appears that at least this portion of the judgment remains unsatisfied and accruing.

Plaintiffs do not explain how these developments can be construed as a change in plaintiffs' position in reliance on the Assistance Agreement.[19] Plaintiffs cannot show that the OTS regulators, FHLBB, or the Assistance Agreement required that Hansen Bancorp assume the Midlantic debt. Moreover, plaintiffs fail to explain how anything in those documents would cause Hansen Bancorp to assume such obligations. Plaintiffs, no doubt, allowed Hansen Bancorp to assume the debt in reliance on the fact that through Hansen Savings and the Florida Bank it would be able to repay them. The Assistance Agreement, however, made no promise that Hansen Savings would be profitable, and the only remaining performance at the time of the debt transfer was the Government's promise to allow for the thrift's goodwill accounting treatment. In short, plaintiffs' liabilities on the loans were not limited solely to the performance of Hansen Savings, as Hansen Bancorp also comprised the Florida Bank. Regardless of whether the Government could be charged with foreseeing such a change in position, after a year of fact discovery the record is devoid of any evidence showing that Hansen Bancorp assumed the Midlantic loan obligations in reliance on plaintiffs' agreement with the Government. Summary judgment in defendant's favor is appropriate.

### CONCLUSION

Based on the foregoing, the scope of the forthcoming damages trial is limited to plaintiffs' claim for reliance damages, consisting of a claim for professional fees and miscellaneous fees in amounts not specified in this opinion, excluding plaintiffs' claim for losses on the Midlantic loans. Plaintiffs have the burden to prove that these expenditures were caused by plaintiffs' obligations under the Assistance Agreement and were foreseeable to the Government at the time that agreement was made. Defendant has the burden to prove that plaintiffs would have suffered the claimed reliance damages even if the contract had been fully performed. Accordingly,

**IT IS ORDERED,** as follows:

---

**19.** They apparently did not attempt to explain the rationale for assumption of this debt to Dr. Kaplan, who nevertheless included it in his expert calculation of damages. When asked why Hansen Bancorp assumed the debt, Dr. Kaplan responded, "I don't have a clue." Dep. of Donald M. Kaplan, June 21, 2000, at 338.

1. Plaintiffs' motion for summary judgment with respect to their claim for restitution of their $1 million capital contribution is granted.

2. Defendant's motion for summary judgment with respect to plaintiffs' claim for expectancy damages and restitution in the form of saved liquidation costs is granted.

3. Defendant's motion for summary judgment with respect to the Kaplan Report is denied.

4. Defendant's motion for summary judgment with respect to the factual findings of OTS regulators is denied.

5. Plaintiffs' motion for summary judgment with respect to their claim for restitution of professional fees and miscellaneous expenditures is denied. Defendant's motion for summary judgment on this claim is granted.

6. Defendant's motion for summary judgment with respect to whether the $1.2 million dividend paid to plaintiffs is an offset to the award of restitution is denied. Plaintiffs' motion on the same issue is granted.

7. Plaintiffs' motion for summary judgment with respect to their claim for reliance damages measured as management expenses incurred on behalf of Hansen Savings is denied.

8. Plaintiffs' motion for summary judgment with respect to their claim for reliance damages measured as losses incurred on the Midlantic loans is denied. Defendant's motion for summary judgment on this claim is granted.